# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SID LANDAU, | CASE NO. 1:07-CV-00815-AWI-DLB PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED IN PART AND DENIED IN PART |
| v. | |
| W. T. VOSS, et al., | |
| Defendants. | (ECF NO. 48) |
| / | OBJECTIONS DUE WITHIN 30 DAYS |

**Findings and Recommendations**

**I.     Background**

Plaintiff Sid Landau ("Plaintiff") is a civil detainee in the custody of the California Department of Mental Health ("CDMH"), detained pursuant to the Sexually Violent Predator Act ("SVPA"). Cal. Welf. & Inst. Code § 6600. Plaintiff is proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on Plaintiff's complaint, filed June 4, 2007, against Defendants Weinstein, Bresler, Kaur, Winchel, Forrest, and Adcock.[1] On September 18, 2009, Defendants filed a motion for summary judgment.

---

[1] Plaintiff also stated claims against Defendants W. T. Voss, Roberto Morisho, and Wendy Allen. (Order, ECF No. 14.) Defendant Voss was dismissed on May 6, 2010. (ECF No. 71.) Defendant Voss was never served with process, and the record indicates that he may be deceased. Defendant Morisho has not been served with process or appeared in this action.
   Defendants also contend that Defendant Wendy Allen was never served with summons and complaint. (Mem. P. & A. In Supp. Of Mot. Summ. J. 10:15-18.) Contrary to Defendants' assertion in their motion, the record indicates that Defendant Wendy Allen was served with process. (*See* Waiver Of Service Of Summons by Wendy Allen, filed May 24, 2009, ECF No. 28.) She has not answered or otherwise responded to the complaint.

1

1  (Defs.' Mot. Summ. J., ECF No. 48)  On December 17, 2009, Plaintiff filed his opposition.
2  (Pl.'s Opp'n, ECF No. 62.)  On April 12, 2010, Defendants filed their reply.  (Defs.' Reply, ECF
3  No. 69.)  The matter is deemed submitted pursuant to Local Rule 230(l).[2]

**II.     Motion For Summary Judgment**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a Summary Judgment Motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.*  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Id.* at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the

---

[2] The Court provided Plaintiff with notice of the requirements for opposing a motion for summary judgment by the Court in an order filed April 11, 2008. *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting advisory committee's note on 1963 amendments to Fed. R. Civ. P. 56(e)).

In resolving the Motion for Summary Judgment, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E. D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586-87 (citations omitted).

///

## III. Statement of Undisputed Material Facts[3]

### A. Defendant Erica Weinstein[4]

At all relevant times, Defendant Erica Weinstein was employed at Coalinga State Hospital (CSH) as a Senior Psychiatrist. (Defs.' Undisputed Facts ("DUF") 1.) Defendant Weinstein was employed as the Deputy Medical Director from August 2005 through December 2005. From January 2006 through February 2007, she was employed as the Acting Medical Director at CSH. (DUF 2.) Defendant Weinstein's duties as Acting Medical Director Psychiatrist involved implementing policies governing day-to-day operations of the Medical Department at CSH. (DUF 3.) Defendant Weinstein's duties as the acting/deputy Medical Director were administrative in function, involving developing curriculum in psychiatric education for residents and fellows to meet the standard of care, and accreditation. (DUF 4.) Defendant Weinstein met with senior medical staff to discuss department concerns and with executive staff to develop policies to ensure compliance with CDMH polices and procedures. She also oversaw the recruitment of psychiatrists and medical physicians, as well as supervised the Chief Physician and Surgeon of the Medical Department. (DUF 5.)

Defendant Weinstein did not provide medical treatment to Plaintiff for Plaintiff's broken

---

[3] All facts are undisputed, unless otherwise noted.

[4] Plaintiff's verified complaint may be treated as an opposing affidavit to the extent that it is verified and sets forth admissible facts (1) within Plaintiff's personal knowledge and not based merely on Plaintiff's belief and (2) to which Plaintiff is competent to testify. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *Johnson v. Meltzer*, 134 F.3d 1393, 1399-1400 (9th Cir. 1998); *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987); *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985).

Plaintiff disputes Defendants' Undisputed Facts 1, 2, 3, 4, 5, 6, 8, 9, 10, and 11. (Pl.'s Statement of Disputed Facts In Supp. of Pl.'s Opp'n to Defs.' Mot. Summ. J., ECF No. 63) Defendants contend that Plaintiff fails to support his disputes of DUF 5, 9, 10, and 11 with any evidence. Defendants are correct. Pursuant to Local Rule 260(b) and Federal Rule of Civil Procedure 56(e), all disputed facts in a motion for summary judgment must be supported with citation to evidence. Plaintiff's disputes with DUF 5, 9, 10, and 11 go towards the legal interpretation of these facts, which does not dispute those facts. Plaintiff's disputes are thus denied.

Plaintiff disputes DUF 8, contending that the drugs do not "control delusional thinking." This is an immaterial dispute. One way to control delusional thinking would be to produce a calming effect similar to sedation. Plaintiff does not dispute the medical effects of the drugs. Plaintiff also cites to Lippincott's Drug Guide, but fails to provide any supporting evidence, such as an affidavit or discovery document.

Plaintiff's disputes with DUF 1, 2, and 3 concern whether Defendant Weinstein was the medical director for a certain period of time, or throughout her career at CSH. Ultimately, these disputes are immaterial. Whether Defendant Weinstein was acting director or the actual director, she was the medical director of CSH for the relevant period of time.

arm. She does not recall personally providing medical treatment in the past to Plaintiff. (DUF 6.) Defendant Weinstein provided psychiatric care to some of the patients at CSH during the months of September 2006 through October 2006. (DUF 7.) Defendant Weinstein treated patient John Doe whom is alleged to have attacked Plaintiff. She secured a *Calhoun* Order from the Court on patient John Doe allowing for involuntary emergency treatment of John Doe with the medications Haldol and Depakote. The medication controlled delusional thinking and produced a calming effect similar to sedation. The order was placed in John Doe's health file. (DUF 8.) Defendant Weinstein was not present when John Doe assaulted Plaintiff. (DUF 9.)

Defendant Weinstein did not fail in her duties as Medical Director to protect Plaintiff or other patients at CSH from substantial risk of serious assault. (DUF 10.) Defendant Weinstein had no personal involvement with Plaintiff, nor the incident in question. She was not involved with the day-to-day psychiatric care of patients at CSH after hiring Defendant Mohinder Kaur. (DUF 11.)

Plaintiff is suing Dr. Weinstein solely because she was in the chain of command. He is suing everyone he thought responsible for his care from the bottom to the top of chain of command. (DUF 91.)

**B.     Defendant Peter Bresler**[5]

At all relevant times, Defendant Peter Bresler, M.D., was employed by CSH as Chief Physician and Surgeon. Defendant Bresler was employed at CSH from May 2006 through January 2009. (DUF 12.) Defendant Bresler's duties involved supervision of medical staff personnel. He oversaw the performance of medical services to patients. He provided consultations, and approved patient consultations with outside medical facilities. (DUF 13.)

---

[5] Plaintiff disputes DUF 12, 14, 15, and 16. In DUF 12, Plaintiff disputes Defendant Bresler's job title, referring to Defendant Bresler as "CSH Chief Medical Officer." The distinction between "Chief Medical Officer" and "Chief Physician and Surgeon" appears immaterial.

Plaintiff's dispute with DUF 14, 15, and 16 is unsupported by citation to any evidence. Plaintiff's citation to legal cases or statutes is not evidence; it is argument.

Plaintiff also disputes DUF 93, contending that his deposition testimony should be stricken due to his old age and Aspberger's Syndrome. The Court denied Plaintiff's motion to strike his deposition testimony on March 29, 2010. (Order, filed March 29, 2010, ECF No. 67.)

5

Defendant Bresler's administrative duties related to hiring staff, conducting staff meeting to discuss medical treatment of patients. He rarely treated a patient unless there was a necessity to do so due to a shortage of staff. (DUF 14.)

Defendant Bresler did not personally provide medical treatment to Plaintiff relating to the December 11, 2006 incident involving Plaintiff's broken arm. He does not recall ever providing medical treatment to Plaintiff in the past. He provided no supervision to the psychiatric medical team at CSH. Defendant Bresler had no involvement with the mental treatment of Plaintiff or other patients. (DUF 15.) Defendant Bresler did not fail to protect Plaintiff from a substantial risk of serious assault. He had no personal involvement with Plaintiff or the December 11, 2006 incident. Defendant Bresler was not involved with the day-to-day psychiatric care of the patients at CSH. (DUF 16.) Plaintiff is suing Dr. Bresler solely because he was in the chain of command. (DUF 93.)

### C. Defendant September Winchell[6]

At all relevant times, Defendant September Winchell was employed at CSH as the Unit Supervisor for Treatment Unit 2 (TO2). She has been employed at CSH since June 2005. (DUF 17.) Defendant Winchell's duties involve overseeing the nursing services for Treatment Unit 2. She trains shift leads, and instructs level-of-care nursing personnel in nursing procedures, habilitation, and rehabilitation techniques for patients. (DUF 18.) Defendant Winchell schedules and directs the activities of nursing services personnel assigned to her unit, and monitors the performance of staff members' assigned duties. (DUF 19.)

---

[6] Plaintiff disputes DUF 20, 21, 22, 23, 24, 25, and 26. Plaintiff's disputes with DUF 20, 21, 22, 23, 24, and 26 are unsupported by any evidence. Plaintiff appears to be arguing the interpretation of the undisputed facts, which is not a dispute of the facts.
 Plaintiff disputes DUF 25 with his verified complaint, contending that Defendant Winchell took many actions to harass and retaliate against Plaintiff. (Compl. ¶ 56.) Defendants contend that Plaintiff is not competent to testify as to any dispute of these facts, nor does he meet the evidentiary burden. Here, Plaintiff contends that he was harassed and abused by Defendant Winchell including, inter alia, staff stopped bringing Plaintiff meals to eat. (Compl. ¶ 56.) Plaintiff's complaint is verified, made on personal knowledge, would be admissible as evidence, and Plaintiff is competent to testify. Accordingly, DUF 25 is disputed.
 Plaintiff disputes DUF 92, contending that he is suing Defendant Winchell for harassment and retaliation. Plaintiff also seeks to strike his deposition testimony. As stated previously, Plaintiff's motion to strike his deposition is denied. Plaintiff's dispute with DUF 92 is granted to the extent that it disputes Plaintiff's reasons for bringing suit against Defendant Winchell.

6

Defendant Winchell worked as the unit supervisor from 8:00 a.m. to 5:00 p.m. at the time of the December 11, 2006 incident. She was not on the unit at the time of the December 15, 2006 incident involving Defendants James Forrest and Leo Adcock. (DUF 20.) Plaintiff was transferred to Unit T02 on or about December 13, 2006. Defendant Winchell was informed by her supervisor Rocky Spurgeon that she would be taking Plaintiff on her unit because he had been injured in another unit, and needed to be watched to ensure his safety and recovery from his injury. (DUF 21.)

Defendant Winchell had little interaction with Plaintiff while he was on the unit. She went on medical leave shortly after he arrived on her unit. (DUF 22.) Defendant Winchell was not aware of the December 15, 2006 incident involving Plaintiff and staff members Defendants James Forrest and Leo Adcock. It was not brought to her attention at the time. (DUF 23.) The clinic always leaves the patient room doors open due to potential risk to the staff when alone with patients, and to observe the patients to prevent patient-on-patient attacks. (DUF 24.) Defendant Winchell has never intentionally harassed or retaliated against Plaintiff for any reason, nor has the staff she supervises intentionally harassed or retaliated against Plaintiff, to her knowledge. (DUF 25.) The nursing staff and psychiatric technicians are trained to use professional discretion and to assert the standard of care reasonably expected and consistent within the community standards as well as CSH policies and procedures. (DUF 26.) Plaintiff is suing Defendant Winchell because she was in charge of the Treatment Unit 2 (T02) and was in the chain of command, and harassed and retaliated against Plaintiff. (DUF 92.)

**D.    Defendant Mohinder Kaur**[7]

At all relevant times, Defendant Mohinder Kaur, M.D. was employed at CSH as a Staff

---

[7] Plaintiff disputes DUF 30, 31, 33, 34, 35, 36, 37, 39, 40, 41, and 43. Plaintiff fails to support his disputes with DUF 30, 31, 33, 34, 37, 39, 40, 43, and 44 with citation to any evidence.

Plaintiff contends in DUF 35 and 36 that he was reliably informed and believes that patient John Doe was prescribed oral psychotropic medications that he was intentionally spitting out down the toilet, and that Defendants were aware of this fact. (Compl. ¶ 30.) Plaintiff cannot rely on his verified complaint in this instance to support his dispute. Plaintiff claims knowledge of Defendants' awareness. Plaintiff cannot reasonably know what Defendants are aware of unless he was told of this by someone with actual knowledge, or this awareness can be inferred from documents obtained during discovery from Defendants. The former would be hearsay and inadmissible as evidence. Fed. R. Evid. 801(c), 802. For the latter, Plaintiff provides no citation to any documents. Accordingly, Plaintiff's disputes with DUF 35 and 36 are denied.

7

Psychiatrist. She is now employed as a Supervising Senior Psychiatrist. Defendant Kaur has been employed at CSH since November 2006.(DUF 27.) Defendant Kaur's duties as a staff psychiatrist involved performing psychiatric evaluations, writing orders for admission, transfers, discharges, medications, restraints and seclusions, and suicide precautions. (DUF 28.) Defendant Kaur provided individual and group psychotherapy, evaluated assaultive incidents, attended to suicide threats and attempts of self harm by patients. (DUF 29.) Defendant Kaur's duties as Senior Psychiatrist involve participating in direct patient care, and psychiatric evaluations, consulting on issues pertaining to diagnosis, treatment, and forensic recommendations concerning patients. (DUF 30.) Defendant Kaur oversees the recruitment of psychiatrists and provides supervision to staff psychiatrists. (DUF 31.)

At the time of the December 11, 2006 incident involving John Doe, Defendant Kaur was providing psychiatric treatment to both Plaintiff and patient John Doe. (DUF 32.) Patient John Doe was kept on Medical Acute Unit 2 (MA2) because it was the only locked unit in the hospital at the time. (DUF 33.) Patients like John Doe can be restrained or put into seclusion only when there is imminent risk of self-harm or harm to others. (DUF 34.) Patient Doe was placed under a *Calhoun* Order by the Court for the use of psychotropic involuntary emergency medication in situations warranting immediate intervention concerning his behavior. (DUF 35.)

The policy at CSH is to observe the patient's behavior, and try to mitigate any situation which could trigger unpredictable behavior via verbal and less restrictive interventions. It is Defendant Kaur's professional opinion that there was no time and no reason to seclude or restrain patient John Doe prior to the December 11, 2006 assault on Plaintiff. (DUF 36.) It is Defendant Kaur's professional opinion that there was no time or reason to seclude or restrain patient John Doe prior to the December 11, 2006 assault on Plaintiff. (DUF 37.) Plaintiff was sent to an outside medical facility for treatment after the December 11, 2006 assault. He was then transferred to Treatment Unit 2 (T02). (DUF 38.) It was Defendant Kaur's professional decision to move Plaintiff to T02 unit for purposes of his safety and to ensure he suffered no further injuries by John Doe. (DUF 39.) Defendant Kaur ordered a one-on-one observation by staff concerning Plaintiff's safety reasons. (DUF 40.)

8

There was no way to prevent the attack on Plaintiff by John Doe because John Doe gave no indication to staff that he would attack Plaintiff. (DUF 41.) It is CSH policy to leave the room doors open due to the potential risk to staff when alone with patients, and to observe the patients to prevent patient-on-patient attacks. (DUF 42.) Defendant Kaur did not fail to protect Plaintiff from substantial risk of serious assault because she took all reasonable steps to prevent assault of the Plaintiff. (DUF 43.) Plaintiff's removal from Unit MA2 to T02 was done solely for his own safety and not to intentionally harass or retaliate against him. (DUF 44.)

### E. Defendant Leo Adcock [8]

At all relevant times, Defendant Leo Adcock was employed at CSH as a psychiatric technician. He was employed at CSH from May 2006 through November 2007. (DUF 45.) Defendant Adcock's duties involved supervising patient activities such as unit groups, individual program activities for patients, assisting in rehabilitation therapy, and administering medications. (DUF 46.) Defendant Adcock's other duties involved observation of patients' physical condition and behavior, recording notes in patient charts, searching patients for drugs and contraband, inspection of facility to identify security breaches, and intervention in patient behavior to prevent injuries to patients and staff. (DUF 47.)

Defendant Adcock was working in Treatment Unit 2 (T02) on the 11 p.m. to 7 a.m. shift at the time of the December 15, 2006 incident involving Defendants Forrest and Adcock. (DUF 48.) Defendant Adcock reported to duty on December 15, 2006, when Plaintiff had already been transferred to his unit. (DUF 49.) Plaintiff was already on one-to-one observation for medical and safety reasons. Defendant Adcock understood that Plaintiff was to be observed and in visual sight of staff. (DUF 50.)

He observed Plaintiff walk into the latrine area and the latrine door remained open. (DUF 51.) After awhile other patients started complaining about Plaintiff being in the latrine, stating

---

[8] Plaintiff disputes DUF 50, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, and 65. Plaintiff disputes DUF 50 without citation to evidence. This dispute is denied. Plaintiff disputes DUF 52 through 65 with his version of events that transpired on December 15, 2006. (Compl. ¶¶ 47-55.) Here, Plaintiff's verified complaint is made on personal knowledge, would be admissible as evidence, and Plaintiff is competent to testify. These disputes are granted.

9

1  he would not leave.  (DUF 52.)  Another patient approached staff asking them to remove Plaintiff
2  from the latrine area, and making verbal threats to harm Plaintiff.  (DUF 53.)  Defendant Adcock
3  was asked by psychiatric technician Defendant James Forrest to come with him while he asked
4  Plaintiff to leave the latrine.  (DUF 54.)

5        Defendant Adcock stood waiting and observing as Defendant Forrest asked Plaintiff to
6  leave the latrine.  Plaintiff refused to leave.  Defendant Forrest asked Defendant Adcock to help
7  him escort Plaintiff out of the latrine area.  (DUF 55.)  Defendant Adcock took a hold of Plaintiff
8  by placing one hand under Plaintiff's arm pit, similar to leading a blind person by the arm, and
9  pulled him out of the latrine area.  (DUF 56.)  Defendant Forrest had taken a hold of Plaintiff on
10 the other side, and they proceeded to remove Plaintiff from the latrine.  At all times, they were
11 careful and cautious of Plaintiff's broken arm as to not injure him any further.  (DUF 57.)
12 Plaintiff was not cooperative in leaving the latrine area, yet he moved without an aggressive
13 struggle against efforts to remove him.  (DUF 58.)  Plaintiff complained about having to leave
14 the latrine, and threatened to file a police report after he was taken back to his room.  (DUF 59.)

15       Defendant Adcock did not observe Plaintiff to be in any amount of pain when he was
16 placed in his room.  (DUF 60.)  Plaintiff did not appear to be in any distress concerning his arm.
17 Defendant Adcock was not aware of Plaintiff seeking medical attention concerning his arm or
18 pain related to the latrine incident.  (DUF 61.)  Defendant Adcock used his professional
19 discretion in his decision to remove Plaintiff from the latrine area because of the risk to his safety
20 and to prevent any further incidents with other patients at that time.  (DUF 62.)  Plaintiff's
21 removal from the latrine area was not done to intentionally harass or retaliate against Plaintiff for
22 any reason.  (DUF 63.)  Defendant Adcock's removal of Plaintiff from the latrine area was not
23 done maliciously and sadistically to cause him harm, or to cause him to suffer unnecessary and
24 wanton infliction of pain. (DUF 64.)  Defendant Adcock did not intentionally harass or retaliate
25 against Plaintiff for any reason.  (DUF 65.)

26       Plaintiff disputes Defendant Adcock's version of the December 15, 2006 events in his
27 verified complaint.  Plaintiff contends the following.  On December 15, 2006, at about 10 PM,
28 Plaintiff got out of bed to see the psychiatric tech shift lead to secure permission to close his door

so he could sleep, because it was too noisy. (Compl. ¶ 47(c).) Plaintiff's request was denied, so Plaintiff went into the latrine, sat on a toilet, and enjoyed the silence. (Compl. ¶ 47(d).) Staff kept Plaintiff under visual surveillance through the door window, but then opened the latrine door to observe Plaintiff. (Compl. ¶ 48.) Other residents were angered and asked the staff to close the latrine door, but staff refused. (Compl. ¶ 48.) The other residents asked Plaintiff to leave the latrine, but Plaintiff replied that he was entitled to some privacy. (Compl. ¶ 49.) Plaintiff moved into the handicapped latrine stall. (Compl. ¶ 49.)

At this point, Defendants Adcock and Forrest burst into the stall, grabbed Plaintiff forcibly by his arms, including his surgically repaired broken arm, all the while accusing Plaintiff of wrecking the unit. (Compl. ¶ 50.) Defendants then physically dragged him out of the latrine and forced him back into his room, while Plaintiff struggled unsuccessfully to protect his broken arm from further abuse. (Compl. ¶ 51.) Plaintiff complained of unnecessary and wanton infliction of pain. (Compl. ¶ 52.) Plaintiff complained to the hospital police, who advised Plaintiff to file a complaint with the Patients' Rights Office. (Compl. ¶ 55.)

### F. Defendant James Forrest[9]

At all relevant times, Defendant Forrest was employed as a psychiatric technician at CSH. He was employed from September 2005 through December 2008. (DUF 66.) Defendant Forrest's duties involved supervising patient activities such as unit groups, individual program activities for patients, assisting in rehabilitation therapy, and administering medications. (DUF 67.) Defendant Forrest's other duties involved observation of patients' physical condition and behavior, recording notes in patient charts, searching patients for drugs, and contraband, inspection of facility to identify security breaches, and intervention in patient behavior to prevent injuries to patients and staff. (DUF 68.) At the time of the December 15, 2006 incident, Defendant Forrest was Acting lead psychiatric technician. He worked the night shift from 11 p.m. to 7 a.m. (DUF 69.)

---

[9] Plaintiff disputes DUF 70, 71, 72, 73, 74, 75, 76, and 77. Plaintiff cites to no evidence in his dispute of DUF 70. This dispute is denied. Plaintiff disputes DUF 71 to 77 with his verified complaint. As stated above regarding Defendant Adcock, Plaintiff's verified complaint is made on personal knowledge, would be admissible as evidence, and Plaintiff is competent to testify.

11

On December 15, 2006, Plaintiff was in the latrine area when Defendant Forrest reported to duty. Other patients complained that Plaintiff would not leave the latrine, and started making threats to staff about harming Plaintiff. (DUF 70.) Defendant Forrest, along with Defendant Adcock, went to the latrine area to ask Plaintiff to leave. Plaintiff refused. Defendant Forrest then asked Defendant Adcock to help him escort Plaintiff out of the latrine area. (DUF 71.) Defendant Forrest removed Plaintiff from the latrine area by placing his forearm under Plaintiff's arm pit, and by placing his other hand at Plaintiff's wrist, and pulled him out of the latrine area. (DUF 72.) Defendant Adcock took a hold of Plaintiff on the other side and assisted Defendant Forrest with removing Plaintiff from the latrine. (DUF 73.) Plaintiff was passive-aggressive in his efforts to prevent being removed from the latrine area. He did not put weight on his legs, refusing to walk cooperatively out of the latrine area. (DUF 74.)

Defendant Forrest used his professional discretion in his decision to remove Plaintiff from the latrine area because of the risk to Plaintiff's safety and to prevent any further incidents with other patients at that time. (DUF 75.) Plaintiff's removal from the latrine was not done to intentionally harass or retaliate against Plaintiff for any reason. (DUF 76.) Defendant Adcock's removal of Plaintiff from the latrine area was not done maliciously and sadistically to cause him harm, or to cause him to suffer unnecessary and wanton infliction of pain. (DUF 77.)

Plaintiff disputes DUF 71 to 77 in his verified complaint, as stated above in Part III, section E.

**G.    Non-Defendant Kurt Stephan**

Kurt Stephan (Mr. Stephan) is a psychiatric technician at CSH. He has been employed at CSH since July 2006. He is not a defendant in this case. (DUF 78.) Mr. Stephan's duties involved supervising patient activities such as unit groups, individual program activities for patients, assisting in rehabilitation therapy, and administering medications. (DUF 79.) Mr. Stephan's other duties involved observation of patients' physical condition and behavior, recording notes in patient charts, searching patients for drugs, and contraband, inspection of facility to identify security breaches, and intervention in patient behavior to prevent injuries to patients and staff. (DUF 80.) At the time of the December 11, 2006 incident involving Plaintiff

12

and John Doe, Mr. Stephan was working on Unit MA2.  He worked from 3 p.m. to 11 p.m. (DUF 81.)

On December 11, 2006, Mr. Stephan witnessed patient John Doe assault Plaintiff. (DUF 82.) Mr. Stephan was sitting in the nurse station of unit MA2 at the time of the assault. He heard noises or shouting which caught his attention. (DUF 83.) Mr. Stephan witness John Doe hit Plaintiff and Plaintiff fell to the ground. He then exited the nurse station a short distance away to intervene. (DUF 84.) The attack occurred abruptly and there was nothing Mr. Stephan could have done to prevent it. (DUF 85.) Mr. Stephan ran out of the nurse station, and separated the two patients by placing himself between Plaintiff and John Doe. (DUF 86.) He was able to successfully keep the two patients separated until other staff arrived to assist him. (DUF 87.) Mr. Stephan assessed Plaintiff for injuries once additional staff arrived.  Plaintiff sustained an injury to his left shoulder/arm. (DUF 88.) Patient John Doe was taken and placed in a quiet room. He was calmed down and given oral medication to assist him in calming down. (DUF 89.) It is Mr. Stephan's understanding that Plaintiff was taken to the hospital for further treatment to his shoulder/arm injury.  Mr. Stephan was not aware of any discourse between Plaintiff and John Doe prior to the assault. (DUF 90.

**IV.    Analysis**

    **A.    Failure To Protect**

Plaintiff alleges that Defendants Weinstein, Bresler, and Kaur failed to protect him from substantial risk of serious assault at CSH. (Compl. ¶ 59.) Defendants contend that (1) all Defendants provided appropriate care to Plaintiff, (2) respondeat superior liability against Defendants Weinstein, Winchell, and Bresler cannot state a claim under § 1983, and (3) Defendants are entitled to qualified immunity. (Mem. P. & A. In Supp. Of Mot. Summ. J. 5:17-10:12.)

Civilly detained persons must be afforded "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish," and are thus entitled to protection under the Fourteenth Amendment. *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004). Plaintiff's right to be

1  protected and confined in a safe institution are clearly established.  *See Youngberg*, 457 U.S. at
2  319-22 (finding that involuntarily committed individuals have constitutionally protected rights
3  under Due Process Clause to reasonably safe conditions of confinement and freedom from
4  unreasonable bodily restraint).  Due process requires that civil detainees receive care that is
5  professionally acceptable.  *Id.* at 321.  "Liability may be imposed only when the decision by the
6  professional is such a substantial departure from accepted professional judgment, practice, or
7  standards as to demonstrate that the person responsible actually did not base the decision on such
8  a judgment."  *Id.* at 323.

9       Defendants contend that there was no way they could have prevented Plaintiff's assault
10 by patient John Doe.  (Mem. P. & A. In Supp. Of Mot. Summ. J. 7:17-20.)  Plaintiff contends
11 that patient John Doe had known proclivities for violence against other patients, staff, and
12 prisoners.  (Opp'n 9:6-8.)  Plaintiff contends that the patient's placement in an acute medical unit
13 instead of a locked psychiatric unit set in motion a series of events that led to the patient's attack
14 on Plaintiff.  (Opp'n 9:8-11.)

15      Plaintiff's contentions are unsupported by any evidence.  Plaintiff does not have first-
16 hand knowledge of patient John Doe's history of assaulting other patients and hospital staff.  *See*
17 Fed. R. Evid. 701.  If Plaintiff obtained this information from being told by another person, this
18 would be hearsay and inadmissible.  *Id.* 801(c), 802.  If Plaintiff obtained this information from
19 documents through discovery, Plaintiff has failed to cite to any evidence.  *See* Fed. R. Civ. P.
20 56(e) (opposing party may not rely merely on allegations or denials).

21      According to the undisputed facts, patient John Doe attacked Plaintiff one time.  This
22 attack was unexpected and unforeseeable by the Defendants.  Non-Defendant Kurt Stephan acted
23 quickly in stopping patient John Doe's attack.  Defendant Weinstein oversaw the day-to-day
24 operations and treated patient John Doe by prescribing him medication that would calm and
25 sedate him.  Thus, Defendant Weinstein was not unreasonable in her care of patient John Doe.
26 Defendant Bresler was not involved in treating patient John Doe or Plaintiff.

27      Defendant Kaur treated both John Doe and Plaintiff.  Defendant Kaur in her professional
28 opinion did not find reason to justify restraining John Doe prior to the attack.  There was no way

to prevent the attack on Plaintiff by John Doe because John Doe gave no indication to staff that he would attack Plaintiff. Defendant Kaur thus acted within accepted professional judgment.

Plaintiff has failed to demonstrate any Defendants failed to protect Plaintiff from harm in violation of the Due Process Clause of the Fourteenth Amendment. Defendants acted reasonably under the circumstances. Accordingly, Defendants' motion for summary judgment as to Plaintiff's failure to protect claim should be granted. Judgment should be entered in favor of Defendants Weinstein, Bresler, and Kaur. Because the Court finds summary judgment should be granted in favor of Defendants Weinstein, Kaur, and Bresler for the failure to protect claim, the Court declines to reach Defendants' arguments regarding qualified immunity

**B.    Excessive Force**

Plaintiff alleges that he was assaulted by Defendants Adcock and Forrest on December 15, 2006 when they forcibly removed him from a latrine. (Compl. ¶¶ 50-54.) Defendants contend that Defendants Adcock and Forrest acted reasonably in removing Plaintiff from the latrine area. (Mem. P. & A. In Supp. Of Mot. Summ. J. 11:14-17.)[10]

The Ninth Circuit has not directly addressed the applicable standard for excessive force claims by civil detainees.[11] However, it is clear that civil detainees are entitled to Fourteenth Amendment protections. *See Seling v. Young*, 531 U.S. 250, 265 (2001) ("[D]ue process requires that the conditions and duration of confinement under the [civil confinement act] bear some reasonable relation to the purpose for which persons are committed."); *Jones*, 393 F.3d at 933 ("Civil status means civil status, with all the Fourteenth Amendment rights that accompany

---

[10] Defendants cite to *B. v. Jones*, 454 F. Supp. 18 (W. D. Penn. 1978), as an analogous case. There, the plaintiffs, two mentally disabled individuals who were involuntarily committed to a state hospital, brought suit under § 1983 for violation of the Eighth Amendment. *Id.* at 19. The plaintiffs alleged violation of the Eighth Amendment when they were forcibly dragged on the ground by defendants, two mental retardation aides. *Id.* The *B. v. Jones* court decided that under the Eighth Amendment, the defendants' actions did not rise to the level of a constitutional violation. *Id.* at 21. The district court did not consider the application of the Due Process Clause to the action. Thus, *B. v. Jones* is not persuasive authority here.

[11] In *Hydrick v. Hunter*, 500 F.3d 978, 983 (9th Cir. 2007), the Ninth Circuit held that civil detainees' excessive force claims are evaluated under the more generous Fourteenth Amendment standard. If the detainees show that defendants' conduct sinks below the rights afforded to prisoners under the Eighth Amendment, then they have shown a violation under the Fourteenth Amendment. *Id.* at 997-98. The United States Supreme Court summarily reversed *Hydrick* for failure to adhere to the pleading requirements of Federal Rule of Civil Procedure 8. *Hunter v. Hydrick*, 129 S. Ct. 2431 (2009) (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937(2009)).

15

1  it."). A civil detainee is entitled to "more considerate treatment" than his criminally detained
2  counterparts. *Jones*, 393 F.3d at 932 (quoting *Youngberg*, 457 U.S. at 321-22). In the context of
3  pretrial detainees, the Fourteenth Amendment requires that pretrial detainees not be subject to
4  conditions that amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 536 (1979). "At a bare
5  minimum . . . an individual detained under civil process - like an individual accused but not
6  convicted of a crime - cannot be subject to conditions that "amount to punishment." *Jones*, 393
7  F.3d at 932 (quoting *Bell*, 441 U.S. at 536). Thus, "when a SVPA detainee is confined to
8  conditions identical to, similar to, or more restrictive than, those in which his criminal
9  counterparts are held, [the Court] presume[s] that the detainee is being subjected to punishment."
10 *Id.* (quotations omitted).

11     A claim of excessive force by a pretrial detainee is analyzed under the objective
12 reasonableness standard. *See Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir. 2002)
13 (holding use of force is reasonable after careful balancing of the nature and quality of the
14 intrusion on the individual's constitutional interests against the countervailing government
15 interests at stake) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *see also Andrews v.*
16 *Neer*, 253 F.3d 1052, 1060-61 (8th Cir. 2001) (citing *Johnson-El v. Schoemehl*, 878 F.2d 1043,
17 1048 (8th Cir. 1989)) (applying objective reasonableness standard in context of civil detainees
18 and finding use of force must be necessarily incident to administrative interests in safety,
19 security, and efficiency). Because civil detainees are afforded due process rights at least on par
20 with pretrial detainees, if not better, objectively unreasonable conduct by Defendants would
21 violate Plaintiff's due process rights.

22     Under the objective reasonableness standard, Plaintiff has raised a genuine issue of
23 material fact as to whether Defendants Adcock and Forrest used excessive force in violation of
24 the Fourteenth Amendment. Taking the evidence submitted by Plaintiff in the verified complaint
25 as true, and drawing all inferences therefrom in Plaintiff's favor, there is a triable issue of fact.
26 According to Plaintiff, Defendants Adcock and Forrest, without being asked by any patients,
27 burst into the bathroom stall where Plaintiff sat, and grabbed Plaintiff forcibly by his arms,
28 including his surgically repaired broken arm. Defendants then physically dragged him out of the

16

stall and forced him back into his room, while Plaintiff struggled unsuccessfully to protect his broken arm from further abuse. Plaintiff complained of unnecessary and wanton infliction of pain. Under Plaintiff's version of events, there is a material dispute as to whether Defendants Adcock and Forrest engaged in actions that were necessary for institutional safety, security, and efficiency. Grabbing Plaintiff by his broken arm and dragging him out of the bathroom without cause would not comport with necessary actions for institutional security. Thus, there is a genuine issue of fact whether Defendants Adcock and Forrest violated Plaintiff's constitutional rights, and their motion for summary judgment should be denied.

### C. Retaliation

Plaintiff alleges that Defendants Winchell, Kaur, Adcock, and Forrest intentionally harassed and retaliated against Plaintiff. (Compl. ¶ 56.) Defendants contend that Plaintiff lacks any evidence in support of a retaliation claim. (Mem. P. & A. In Supp. Of Mot. Summ. J. 11:20-25.)

"State action designed to retaliate against and chill political expression strikes at the heart of the First Amendment." *CarePartners, LLC v. Lashway*, 545 F.3d 867 (9th Cir. 2008) (quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)). A plaintiff alleging retaliation for the exercise of First Amendment rights must show that the protected conduct was a "substantial" or "motivating" factor in the defendants' actions. *Sorrano's Gasco*, 874 F.2d at 1314; *cf. Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) ("Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." ).

Based on the pleadings and other submitted documents, there is no genuine issue of triable fact as to a retaliation claim. Even accepting as true that Plaintiff was harassed by Defendants Winchell, Kaur, Adcock, and Forrest, the Court finds that Plaintiff fails to link

17

Defendants' harassing behavior to any protected conduct by Plaintiff.[12] Thus, there is no genuine issue as to a retaliation claim. Summary judgment should be granted in favor of Defendants Winchell, Kaur, Adcock, and Forrest for Plaintiff's retaliation claim.

### IV.     Conclusion and Recommendation

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment, filed September 18, 2009, should be GRANTED and judgment entered in favor of Defendants Weinstein, Bresler, and Kaur for the failure to protect claim, and in favor of Defendants Winchell, Kaur, Adcock, and Forrest for the retaliation claim; and

2. Defendants' motion should be DENIED for the excessive force claim against Defendants Adcock and Forrest.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   July 13, 2010                              /s/ Dennis L. Beck
                                                          UNITED STATES MAGISTRATE JUDGE

---

[12] The actions which Plaintiff alleges were harassing include: Defendants' treatment causing Plaintiff to lose sleep; Plaintiff's PAS level being taken; arts and crafts being destroyed; regularly cursed and yelled at Plaintiff; staff no longer bringing meals to Plaintiff; and Defendants giving Plaintiff tuna as a meal for an entire day. (Compl. ¶ 56.)